The next matter, number 23-1508, United States v. Dana A. Pullman, and number 23-1510, United States v. Ann M. Lynch, consolidated cases. At this time, would counsel for Appellant Pullman please introduce herself on the record to begin? Good morning, Your Honors. May it please the Court, Judith Meisner representing Dana Pullman. You may begin. And I'd like to reserve two minutes for rebuttal. May. Thank you. This case involves charges of a racketeering conspiracy, four counts of wire fraud, including one count of honest services wire fraud, all alleged to have been predicates for the racketeering conspiracy, an obstruction of justice charge also alleged to be a racketeering predicate, and tax offenses. The government agrees that as to three wire fraud counts relating to Lynch Associates' provision of services to two companies, that judgments of acquittal are warranted. That leaves the honest services fraud and the obstruction counts as the two racketeering predicates. And I'd like to first address the obstruction count, and then the honest services fraud. Now, the obstruction count charged that the defendants had corruptly endeavored to obstruct a grand jury investigation by attempting to manipulate records required to be produced pursuant to a grand jury subpoena. Mr. Pullman was the president of the state police union called SPAM, and SPAM had been involved in a very lengthy grievance process related to days off lost compensation, where troopers had been called in to work on their days off and what was the appropriate compensation for that. That had languished from 2005 until approximately 2012 or 13, when Mr. Pullman became president of the union. And Lynch Associates was a lobbying firm that had been hired by his predecessor for lobbying. We don't have a huge amount of time, and I think we know the facts pretty well. Okay, great. Staying with the obstruction charge, how do you deal with the fact that it appears that on two occasions, Pullman tried to get an official of SPAM to lie about SPAM's records in responding to a subpoena? Well, I don't, I question whether he endeavored to do that. He, after the- Twice, we have a subordinate who he has authority over, and he twice suggests that that subordinate tell the FBI that all the records are destroyed after a year. And the fellow doesn't do it, and he then suggests it again. Why isn't that an endeavor? Well, in August, when the second subpoena for SPAM arrived, which did not ask for the expense records, but asked for a variety of other records, and Daley believed that expense records would be next, and he couldn't find them. And he tells Mr. Pullman that the records were missing, and he was going to have to tell the government he'd lost or misplaced them. And Mr. Pullman responded, can't we just tell them we have an internal policy to destroy them after a year? It's a question. Is that the key to your argument, that it's a question? That it's a question without any follow-up, that there was no pressure, there was no offer of any kind of payment or reward, unlike- Does it matter that he asked the same question again? No, because Mr. Daley's response the first time was, I don't think that's an option. So when the subpoena finally arrives in September, and it does ask for the expense records, he asks again. And Daley's- Are you sure we can't tell them? Daley's response is- This isn't expressing uncertainty over whether it's proper or not. It's expressing uncertainty over whether they will or will not lie to the FBI. That seems different. There's no uncertain- The conversation doesn't suggest that anyone thought that there was such a policy. Well, it's still not- It's still a question. It may be a question as to- The intent may be there. What was the question? Can we just obstruct justice? Well, the intent may be there, but the question is, is the endeavor there? You need two prongs. Well, then, why isn't that just a jury question, given that it's a superior to a subordinate, and he twice suggests it? Because the evidence is insufficient to support any kind of follow-up to the question. He didn't say, you have to do this or else. He didn't say, I'll give you something or else. I mean, endeavor is less than an attempt, correct? So, I mean, endeavor is less than an attempt, right? It's less than an attempt, but there has to be some threshold. It has to be more than simply requiring- Right, and so the jury could have concluded, he's the boss. He's telling the subordinate. He hopes the subordinate will go along with the suggestion. The subordinate doesn't want to do it. He knows he's maybe getting- The jury could have found he knows he's getting close to something he really shouldn't be doing, so he backs off. But why does that affect- That's what he wanted to have happen, or at least the jury could have so concluded. Well, I still- I think that there still has to be something more than simply the question. I mean, if you look at the facts in the cases that we cited and that the government cited, there's more than simply asking a question which indicates- which may indicate an intent to obstruct and then taking the answer no and leaving it. Suppose he said to him, can't we just shred those papers so they'll never find them? And the fellow said, I don't know if we should do that. And then the next day, he says again to his subordinate, can't we just shred them? You're saying that wouldn't be an endeavor as I understand it. Well, I mean, there you have- it's something different too. You have repeated immediate repetition of a request. Here you have discussions that are separated by around a month and the production of a subpoena. The first one was somewhat of a hypothetical because those records had not been requested. By- in September, they were. He says, are you sure you can't- that we can't do this? And when Daly says, no, I've researched. We can't do it. He lets it go. There's no- not four or five repetitions of a request. There's no offer of money as there was in Tedesco. There's just simply nothing. Why does it have to be money? I don't understand that. I mean, the idea is he knows the government wanted records, right? He knows that. There's been a subpoena. And then instead of diligently trying to provide the records, his response is, let's see if he'll follow my lie to make up a policy that doesn't exist that we can tell the government. And he needs that because, I think, he knows those records don't exist that he needs to have to keep himself out of trouble. Isn't that like- I mean, I don't understand what money that has to do with it because that's not what we're worried about. We're worried about not following through with your obligation to produce records. Right. But in terms of whether Mr. Pullman was endeavoring to obstruct that, I think Aguilar suggests that there has to be more than simply an intent. And that this- An intent would suggest he got up in the morning and said, I hope the FBI believes that we have this policy. There, he has an intent. Does nothing. He picks up the phone, though, and calls the guy and says, can't we tell the FBI this? That sounds like not just intent, but it sounds like an effort to implement the intent. It's a question of the degree of effort. And I think that the cases suggest that you need more than simply a request. So I'd like to just briefly address the honest services. Skilling limits honest services brought to bribery and the kickback schemes. The government here argued that Pullman and Lynch's conduct in connection with the Days of Kickback. Government agrees you need a quid pro quo. And here, we maintain that you did not have that. There was a contract entered into for $200,000 for Lynch Associates to do extensive paperwork, gathering, compiling documents, making, coming up with a formula to increase, which increased the value of the settlement from $5 million to $21 million. In December of 2013, Lynch Associates requested additional funds. They wanted $500,000. Mr. Pullman agreed $350,000 would be the price. There was no agreement, no evidence of any agreement at that time that Mr. Pullman was going to receive anything in return for that. There was no evidence that he was going. So it's just a circumstance when you say no evidence, I mean, they say it's a circumstantial case, which is that the timing, his behavior and being so insistent about getting the money, the check coming to his wife right after that, and then the evidence of the person saying he was trying to get a check from Ann altogether is enough for a jury circumstantially to conclude you're just saying that's not enough. Is that the idea? That the request, that the phone call came after the settlement had been reached. Isn't that the problem on the timing? Because as I understand it, the $150,000 was never reduced to a contract. So it was never reduced in writing, correct? Right. So her ability to enforce it was not completely reliable. And before he performs that $150,000, that's when he tells her that he wants $20,000. So she's got the person who controls whether she gets the $150,000 or not telling her he wants $20,000. That sounds like him calling up and saying, if you want the $150,000, you've got to give me a kickback of $20,000. Well, there was no testimony that he requested $20,000. The only testimony was... He said he'd hit him. It was worse for you. That she hit him up for a check. Right. There was no discussion of any kind of amount. And proximity of the check in an amount right after that would certainly permit a jury to infer, I guess he was looking for $20,000. Well, if there are alternative reasonable inferences that are equivalent, then you don't have proof beyond a reasonable doubt. If your sufficiency challenge failed, you still have the instructional challenge. Could you discuss that? Sure.  The government argued and the court instructed that Mr. Pullman owed a fiduciary duty to both SPAM and the Commonwealth in connection with... When you say the Commonwealth is error... Commonwealth is error... When you say that's Yates' error... Yes. How do we do the harmlessness analysis if it is Yates' error? I think that it's not harmless because you don't know. That's what Yates said. When you don't know whether the jury relied on a legally permissible theory or a legally impermissible theory, you vacate... But you can do harmlessness under Yates. I'm pretty sure about that. One way to think about it is, well, he's clearly a fiduciary to the union. He's the president of the union. So if you think about it that way, it's harmless. As far as the fact of fiduciary, is that what we think about or do we think about whether the entire SPAM theory is overwhelming? Well, I think it's whether the whole theory of honest services fraud is overwhelming. And if you do not have a fiduciary duty to the Commonwealth, the jury could have concluded that he had a fiduciary duty to the Commonwealth, which he abrogated. He brought over $21 million plus another $9 million in benefits. If on the SPAM theory, just walk me through why that evidence in your view is not overwhelming. Is that because of the... And I realize there's no direct evidence, but with respect to the phone call, which would seem to be a key part of the government's case about him hitting up for the check, that's a third party report about that having occurred. Is that right? Yes, that's... And the exact words that he used aren't clear. He said he did not remember what his mother had said. The connotation was that she had, that he had, that Dana had hit her up for a check. And there is a check to the wife immediately thereafter. Right. There is a check to the wife. But... And the grovelment of your theory is none of that matters because the agreement was made much earlier for the $150,000 and at that point, no request for a check was made and that's the operative time we should be looking at. That is the operative... You have to look for an agreement and that there was no agreement at the time. There was no agreement at the time of the settlement and... And do you have a response to Judge Kayada's question, which was, but that agreement, so to speak, was quite squishy. And so what the kickback was for was for Pullman to make good on something that SPAM certainly could have fought, probably, maybe successfully, to never have paid her. And that that was what the kickback was for. For SPAM to stand down, make good on it, no fighting about it, and for that there was a kickback. Well, but there was no indication that SPAM was not going to pay the $150,000. There was evidence that Daly and the other guy were not happy about it. Well, there was evidence that Daly was not happy about it. There was evidence that Hunter was not happy and felt that it should have been done by somebody else, with no evidence that that would have been better or cheaper. You separately make the argument as to that exchange, there just was not evidence of a quid pro quo arrangement about the $20,000.  So... And then that either is, I mean, the evidence either supports you or doesn't support you. Excuse me? The evidence either supports you on that point or does not. Correct. Thank you. Thank you, Counsel. At this time, would Counsel for Lynch, Appellant Lynch, please introduce himself on the record to begin. Good morning, Chief Judge Barron. Your Honors. My name is Scott Lopez and I have the honor of representing Anne Lynch in this appeal. I'd like to reserve one minute for rebuttal. In the prologue to his recent new book, Overruled, the Human Toll of Too Much Law, Justice Gorsuch asks the question, what happens to our respect for law itself when the law no longer just reflects common sense norms but includes unpredictable traps for the unwary? Justice Gorsuch's observation is particularly appropriate in this case. In this case, Anne Lynch, a 73-year-old former lobbyist and grandmother with no prior record, is before this court having been convicted of, among other crimes, a conspiracy to violate the Racketeer Influence and Corrupt Organization Act, known as RICO. In other words, a law passed by Congress to prosecute organized crimes figures was used by the government in this case to prosecute a 73-year-old. Just because we don't have a huge amount of time, can you just get to the legal argument that you want us to consider? Certainly, Your Honor. Your Honor, I agree with Counsel for Mr. Pullman that there was insufficient evidence to establish honest services fraud. In skilling, this court made it very clear that the cases were limited to bribes and kickbacks. That's what was charged here, that it was a bribe or a kickback. The government never proved any kickback. What was he hitting her up for? He wasn't hitting her up for anything. He asked for a check because they had developed a relationship whereby she paid referral fees when work was referred to her. To his wife? Well, Your Honor, that fact at first seems suspicious, but in reality, just like he asked the government's star witness, Peter D. ... I forget his last name at the moment. The government's key witness.  D. Agostino. Yes, Your Honor. Thank you. Just like he asked D. Agostino to write a check out to his wife, which he did with respect to the Rafferty payments, which were not indicted here, were not considered kickbacks, were not argued to be kickbacks, but were in fact referral fees and which Mr. D. Agostino saw nothing wrong with it. That's exactly what happened with respect to the other matters. Now, you have to understand, and I'm actually ... What's the difference in your view that we should settle on to distinguish a kickback and a referral fee paid to a fiduciary of the opposing party? The distinction is with respect to the agreement. The government never proved any agreement here. Not by direct evidence, not by circumstantial evidence. The government has, over time, changed its operative facts in order to try to show a quid pro quo when no quid pro quo existed. Suppose the record showed this with respect to that extra money that she's asking for when they ... I guess it's the extra 150, is that right? Is that the number? Your Honor, with respect to the ... First of all, the contract for $200,000 was never signed by Ann Lynch. If Ann Lynch wanted to enforce that contract, she would have been ... We get to the point where there's another 150 that her firm is asking for. A year after the matter had been settled for $21 million, there was an ongoing discussion, an ongoing work by Lynch Associates with respect to the matter in order to ... And they come to a side agreement that the firm will get another 150, right? That's what the government alleges. We don't know what the agreement was because no one testified to what the agreement was. Mr. DiAgostino didn't know what the agreement was. All we know is that at some ... We do know that Pullman goes to Daley and says, send them a check, right? Send the $150,000 to ... We know that Pullman asked for a check from Mr. Daley, and that Mr. Daley, who allegedly was not comfortable with that, had some pushback. But he wrote the check. I take all these points that there's a question as to whether the evidence shows there was an agreement for the extra 150, right? Whether there was an agreement and whether it was a quid pro quo. But on the second thing, to go back to Judge Chiara's question, to distinguish between a referral fee and a kickback. Suppose the evidence showed that there was an agreement to pay the extra 150. And the evidence further showed, I'll give you the 150 if you give my wife 20. Is that a kickback or a referral on your view? I'm not saying the evidence shows that. I just want to understand your legal theory. Is that a kickback or a referral fee? If he made the payment conditioned upon the receipt of the 150, that would be extortion. That wouldn't be a kickback. And that's, at one point, what the government argued, but now has backtracked on that as well, trying to argue that extortion and bribery are the same thing. They didn't prove a bribery. They never argued a bribery. And they didn't prove a kickback. What they proved was that there was a settlement, that after the settlement, Mr. DiAgostino... Just so we can keep things straight, in the scenario I just presented, you're not even saying it was just a referral fee. That's fine. That doesn't mean you lose. I'm just trying to understand the argument. In the scenario I'm presenting, if I hear you right now, you're not saying, oh, it was just a referral fee. What I heard you say is, it's not a kickback because it's extortion, and that wasn't charged. Is that the actual argument you're then making? What I'm saying is it wasn't a kickback because there's other explanations for why the check was given. The suspicious nature of the check, because it was made out to Ms. Pullman, raises questions about what it is. But the point is that the government... When it's occurring, it's a little bit of a funny point to be giving the referral fee. It's after the initial contract. Now we're at this next stage where there's the extra $150,000. Now you're saying that's the referral fee? What I'm saying is that there was a relationship between Mr. Pullman and Ms. Lynch, demonstrated by the other payments that were made, either to himself or to his wife with respect to certain matters, where Ms. Lynch provided Mr. Pullman with monetary compensation because he referred matters to her. Now we attempted to show that at trial. We presented evidence through Mr. O'Neill that referral fees were something that was done in a lobbyist. The problem here is that the government didn't prove beyond a reasonable doubt that the payment, when it was made, was in fact a kickback versus something else. As our position, it could have been a referral fee, it could have been a gift, it could have been just an expression of thankfulness in order to continue this business relationship. Because keep in mind, at that point in time, they were considering, and ultimately the Sons ended up being the owners of Lynch Associates, and Spam was Lynch Associates' largest client. So there was a reason why Anne Lynch would want to keep Dana Pullman happy and Spam's business going forward. Do you agree that the $150,000 agreement to make the payment, assuming that that existed, was not reduced to writing and was not ironclad? Would you agree with that? Assuming that that... Well, none of these agreements were ironclad. Right, okay. So if that's the case, and then you get to the point when it's time to make good on this non-ironclad, kind of wishy-washy situation arrangement that they have with each other, and then, at that moment, when it's time to make good, Pullman says, I need a check. And then, immediately after that, the $150,000 comes, the $20,000 comes. I understand what you're saying, but why couldn't the jury say, that was a kickback, in order for Pullman to pull the trigger instead of saying, we didn't have an agreement, which, since there was nothing in writing, he could have said. The concept of a kickback is that she paid the money in order to cause Pullman to do an act, an official act. Right, pay the $150,000. Well, it was $250,000, first of all. That was a check, number one. Number two, they had only paid, up until that point in time, $100,000 out of the $200,000. That's why it was $250,000. As far as the $350,000, we have no evidence as to how that agreement was reached, other than what we know is that Mr. Pullman decided at some point, instead of accepting Mr. DiAgostino's request for $500,000, $300,000 more than the $200,000, he agreed to split the baby and give $150,000 for work, which the government admits was done, and which resulted in this, what ultimately became over a $30 million settlement, in favor of the State Police Union, which gets to the fiduciary issue that my sister raised with respect. Mr. Pullman didn't breach his fiduciary duties to anyone. What he did was hire Lynch Associates to negotiate a settlement, which was very beneficial to SPAM and to the State Police. Now, as we... The point is that if you look at whether or not the government proved that there was an agreement, not circumstantially whether or not it may have been, or whether it could have been, but whether there was in fact an agreement that $20,000 would be paid if the $150,000 extra were paid, that never was proven. It didn't exist. And I stand before you today asking to look at the record. There's nothing in the record to show that there was any agreement. And if there was no agreement, according to Snyder, the timing of the payment is irrelevant.  Thank you. Thank you, counsel. At this time, would counsel for the government please introduce themselves on the record to begin? Good morning. May it please the Court. Alexia DiVincente on behalf of the United States. To pick up where counsel just left off with the honor services fraud, the defendant's arguments here are alighting a key point which has come up in the questioning, which is that this personal agreement that the defendants reached in December of 2020 was utterly unenforceable, which meant that Pullman had the power to follow through on it or not. And when a person with such power demands a payment in exchange for exercising it, the law is clear that that is a bribe, or as applied here, a kickback. There's three different terms that have been thrown out, and I'm trying to figure out how they match up to these facts and whether what happened in the conversation would be relevant to sorting between them. There's extortion, there's bribe, and there's kickback. What was charged? Just kickback? A bribe or kickback. But not extortion? Correct, yes. So just in the government's understanding, can you help me understand what the difference is in a context like this? This court has said that bribery and extortion can be two sides of the same coin. Where a check is demanded and Lynch agrees to it without reservation, seemingly, the law supports the idea that that can be considered a bribe. Now, as between a bribe and a kickback... A bribe by her to him? Correct. Or a kickback, which is really just a specialized form of a bribe in which the money that is being paid is coming from the business that's being routed to the third party. Is it relevant that he's demanding it with this fear hanging over her of terminating $150,000 that she thought she would otherwise get? In other words, because there's at least in the Pullman brief, the idea is that that's economic fear being leveraged against it. So when you say without reservation, in that setting it's not quite without reservation. She's not your typical briber who's trying to pay you to get something to happen. But maybe I'm wrong in thinking that there's any difference. I think it's relevant there in referring to economic fear. She had no right to this money. Again, this was an agreement that wasn't reduced to writing. This was a handshake agreement between two friends. We know that each of the other agreements between Spam and Lynch Associates was reduced to writing. That helps make it a bribe or a kickback and can't be extortion. Is that the idea? Yes, correct. Where someone is not taking away something that is legally due to them, one can find that this was a bribe, correct? Again, this agreement was not reduced to writing. The lobbying agreement was reduced to writing. The public relations agreement was reduced to writing. The original April 2013 DOL agreement was reduced to writing. In fact, that agreement contained a provision that specifically said that no changes would be valid unless reduced to writing and agreed to by the parties. Now, it is clear that at some point the topic of additional money potentially being paid to Lynch Associates comes up. But it's also clear that that was never definitively resolved. You have a September 29th email from Ed Hunter asking Pullman to meet to discuss pressing issues, which included his view that additional money shouldn't be paid under this contract. And that email makes clear that at least according to Ed Hunter, the issue hadn't been resolved. You then have testimony from Daly who says that the first he ever heard that this entire 350 was going to go to Lynch Associates was when Pullman came to his office, banged his fist on the table, said, stop breaking my up and balls and give me the check. Moreover, D'Agostino, a Lynch Associates employee himself, acknowledged in his testimony that Lynch Associates could have been held to the original terms of that agreement. So the bottom line is, again, this is a handshake agreement between two friends, utterly unenforceable, which meant that execution of the agreement depended upon additional action from Pullman, action which the jury could readily find. Pullman threatened to withhold absent a payment from Lynch. Just going back to Judge, shifting over to the instructional error issue and Yates. I know you take the position that it's not a Yates problem, but if we were to disagree with you on that, on the idea that there's just no set of facts in which this theory of being a fiduciary could exist, so it was a legally invalid theory. I know you disagree with that, but assuming that were true, Judge Aframe asked, how do we do the harmless error in that setting? How do we do it? Just to be clear, not only do we dispute that it was a legally invalid theory, we also dispute that this issue was even preserved, where the defendants were repeatedly asking for this issue to go to the jury. But to get to Your Honor's question, Skilling makes clear that the Hedgepath v. Pulido harmlessness analysis applies even on direct review. So we know that there is a harmlessness inquiry that can be undertaken here. What are we looking for when we have a legally invalid theory, assuming we do, a legally valid theory, which is the spam theory, and no special verdict form? Do I look and see what? Well, I think the harmlessness beyond a reasonable doubt question is asking whether it's harmless beyond a reasonable doubt that even if the jury hadn't been presented with the legally erroneous theory, it nevertheless would have been convicted. And so does that mean the spam theory as a whole has to be overwhelming or sufficient enough, but not beyond sufficient? No, I think the question is whether the evidence of a fiduciary duty is overwhelming. Why would that be when it's a Yates error? That's what I'm not fully understanding. Because the Yates error only goes to that particular element of the offense. It goes to the whole theory. In other words, it's the idea that you could have been convicted as a fiduciary of the Commonwealth. That theory is out. So now the only theory left is the spam theory. And we're worried that the jury may have relied on the Commonwealth theory. Why wouldn't it make sense to say, well, don't worry about that if it's overwhelming that they would have convicted on the spam theory? That's going to be what would happen even if you had never presented the other theory. Where the legal error alleged is specific to one particular element. This was only about the question of to whom he owed a fiduciary duty and the failure to submit that. I agree when it's not a Yates problem. But what I think the idea is if it is a Yates problem, that's not quite right. The whole theory is an impossible theory. In other words, it's not just an instructional error in the sense that you took away from the jury the question of whether he was a fiduciary to the Commonwealth. Their argument is he could not have been a fiduciary of the Commonwealth even if you proved everything you went to prove. Even if you asked the jury and they said, oh, yes. He just can't be because he was on the wrong side of the table. That's their argument. That's what makes it a Yates error if I'm understanding. I guess I'm not seeing why in that setting you wouldn't want to make sure the evidence was overwhelming of the valid theory. Again, I think what is being called legally invalid is an instruction relative to one specific element of the offense. What you're looking to is whether or not the evidence of that particular element is overwhelming even when you take away the legally invalid idea that he could have owed a fiduciary duty to the Commonwealth. Again, caveating that we do not agree that this was even a password. Aren't the two fiduciary theories just two different access ramps to essentially the same highway? The fact that you couldn't get on on the fiduciary duty owed to the state doesn't mean that we therefore have to analyze not just the validity of the other fiduciary theory, but then everything else that in common falls under both theories? Where the point of contention regarding the access ramp is just the individual element, we would disagree. First of all, there are several hurdles to even get through to get to that point. Again, this is not a preserved claim. The defendants, in objecting to the jury instructions, they were specifically pointing the district court to their own jury instruction which told the jury that it had to find whether or not Pullman owed a fiduciary duty to the Commonwealth or to Spam, and then would have given the jury the factors to consider in making that determination. When the defendant then objects after the instruction, the objection specifically references a Rule 29 motion which is arguing simply that the evidence was insufficient there. If there's any doubts about that, all you have to do is look to the later Rule 29 motion where the defendant citing a decision of another district court suddenly is calling this a legally invalid theory. You're about to make another point, though, in response to Judge Chiara, which is that even if we thought there was error and it was preserved, and even if we thought you don't just look at the element where you're about to say it still was overwhelming even on the Spam theory? Yes, it absolutely was overwhelming on the Spam theory. On the Spam theory, just to address the element in dispute here, the evidence was uncontested and overwhelming that Pullman owed a fiduciary duty to Spam. In closing argument, it was never suggested that he couldn't, and in post-trial briefing, the defendants conceded this point. Was the evidence of the honor service fraud under the Spam theory overwhelming in the government's view? Absolutely, we believe it was. Even if you are looking at the entirety of the theory, the court can still get there. Does it need to be overwhelming if it's identical to what would have had to have been found under the state theory? In other words, we know the jury convicted. They may have, in theory, said that he's a fiduciary because he's employed by the state, so he owes honor services to the state. But then everything else, did he have an agreement, did he demand the money, did he get the kickback and everything, is identical under both fiduciary duties, and we know that the jury convicted. So as long as we know that it's overwhelming that he was a fiduciary for Spam, why would it have made any difference at all whether the rest of the evidence was overwhelming or only sufficient? I think your honor is saying, probably in a better manner, exactly the point that I'm trying to make here. Maybe this is wrong, that a jury might be a little bit more upset with somebody trying to fleece the commonwealth, of which they're residents, and have a private entity that they're not. Well, first of all, I don't know how that's any worse than fleecing the union of which you are a president, but more to the point, the defendants have never made that argument, so it's not properly before the court. Unless there are any further questions on either honor services fraud or the instructional claim related to it. I guess it just goes to the point about how to think about Yates, which is the concern is that you're presenting a theory of law that's wrong to convict on. So the jury's mindset's on that thing, and that taints their thinking, unless the other legally valid theory is fully supported. So is there some authority that the government has that tells us, with respect to the issues we've been asking about, how to do the harmlessness under Yates? I am not aware, off the top of my head, of any authority directly going to this point. But again, I think it's worth emphasizing that the theories were exactly the same. Every other element of this offense, the evidence offered to support it, was exactly the same. We know the jury found all of those other elements satisfied. The only point in dispute here is to whom does he owe a fiduciary duty? What is your view on whether, could he have been a fiduciary to the state? So I thought the error was that the court did not permit the jury to make that finding, that the way it instructed, it instructed he is a fiduciary to the Commonwealth because he's an employee. And I thought that was wrong. But that seems different than the question of, could a properly instructed jury being told, this is your call, here are the things to think about, what is your view, could he have been a fiduciary to the Commonwealth? I'll agree. I don't know that the evidence presented here was sufficient to show that. And we agree that that question should have gone to the jury. However, I don't think it is beyond the pale to think that a jury could rationally find, under a particular set of facts, that he did owe a fiduciary duty to the Commonwealth. Recall, Pullman was on release to the Union, but he was still collecting a salary from the Commonwealth. He still had several privileges attendant to his status as a state trooper. Some of his activities, he may have had their argument, which I'm not saying is right, but I think it goes to Judge Afram's question. Their argument is, with respect to this transaction, he could not have had a fiduciary duty to them because of the role he was playing for SPAN. I understand the agreement. I don't... Why is that wrong? What's the world in which there would have been some way of finding, with respect to this transaction, that he could have had a fiduciary in this transaction to the Commonwealth? There's no dispute that, as the President of the Union, he owed a duty to the Union members to negotiate forcefully against the Commonwealth. But it's completely reasonable to think that, when negotiating against a Commonwealth, by whom you are still employed, you have a duty not to be accepting kickbacks that are coming out of that settlement agreement. I think there is a set of facts on which a jury could find that there was a fiduciary duty owed to the Commonwealth. Unless there are any further questions on that, to just briefly address the obstruction charge, I take the defendant's argument here to be that the fact that these were mere asks is somehow insufficient to show an endeavor, but I think it's common sense that an ask, depending on how it's phrased and the connotation, can be not just a question about whether something is a theoretical possibility, but evidence of an intent that that particular action should happen. And the jury fairly found on these facts that that is what happened. It's also worth noting that the time period of the obstruction efforts that were charged in the indictment was the September to October time period. And so it didn't include the initial question that Pullman asked of Daley. Can't we just tell them that there's this fake destruction policy? In other words, the government didn't indict these defendants, didn't charge them with obstruction, based on a one-off ask. The government charged obstruction and the jury found obstruction based on the fact that when that didn't work out for Pullman, he then enlists Lynch to go to Keston and ask that these receipts be submitted as if they had always been there. And then when that fails, he turns around and goes back to Daley and again says, are you sure we can't just say that there was a destruction policy? Under case law, I think it's perfectly clear that that is more than sufficient for the jury to have found that the defendants committed obstruction. Unless there are questions on... The Lynch to the lawyer seems much weaker to me. They're just sort of... You could at least read that. The first time I read it, I was sort of like, well, she's just telling him, I'm going to get some documents for you. Can you just include them in the production? And that didn't strike me as clearly as, hey, can we make up some policy that doesn't exist? What's your reaction to why that was obstructive? Well, a few points. First of all, despite adopting Pullman's arguments on the obstruction count, Lynch doesn't explain or articulate any reasons why the analysis should look different as to her. So I think that argument would be waived. However, the government's view is that the jury could rely on the Keston testimony as part and parcel of its analysis here. Keston was candid that he could not recall the exact words that Lynch said to him, but the jury had every reason to credit his impression of what it was that she was trying to convey. It was very clear that Keston had no interest in being there to testify against Pullman. He expressly stated that he was proud of and had a great view of Pullman in his role as president and what he had done for the union. On this point, suppose what the words Keston heard were the words that we have independent of Keston or what we surely have stated as she was saying, which is just as Judge Aframe described it, which is she says, you know, can you hold off? I'm looking for some more things. Well, first of all, Keston's testimony was that Lynch asked if he would hold off, which suggests that that's not just a, is this a theoretical possibility, but are you willing to? Hold off because I'm looking for some more receipts. Would that be enough to justify the impression that she was obstructive? Well, it's not just words, but how words are conveyed that informs the impression of what is being asked and Keston was in the position, having heard the words himself, to draw inferences about what it was that she was implying there. And it's also worth noting that there was evidence that the defendants in their arguments entirely ignore that corroborates the impression that Keston was drawing from this conversation with Lynch. If indeed Pullman were not concerned with having these receipts submitted and made to look like they had been submitted all along, he could have done what other members of the spam e-board were doing, which was gather these receipts and produce them. That's not what he did. He then turns around and goes back to Daly and says, okay, can we, you know, once again asking, are you sure we can't say that there was this destruction policy? Moreover, and here's a key point on this, if Lynch's ask were the innocent one that the defendants are positing, there's no need for her to lie to agents when she's interviewed and say, I had nothing to do with expense receipts. No, I've never talked to Pullman about this. Is that a separate obstructive counter? Excuse me? Is that a separate count of obstruction against her? That is a separate count of obstruction solely against Lynch, yes. And so, just so I understand the government's theory, even if the other count about what she says to Keston were insufficient, it wouldn't affect anything in your view because there's still then two predicate asks for the RICO against Lynch based on the lying to the FBI? There would, yeah, correct. Lynch has not separately challenged the conviction based on the false statements to the FBI and that conviction stands no matter what. So as long as the honest service is good against her, then the RICO is good against her? Correct, yes. Thanks. Unless there are any further questions, the government would rest on its brief. Thank you, counsel. At this time, would counsel for the appellant please reintroduce herself on the record to begin? Judith Meisner for Mr. Pullman. Addressing the obstruction issue that the court was just discussing, if there is, if you've got, you have alternative, reasonably equivalent alternative theories here in that in terms of what Keston's impression was because... Does it make any difference given her, what she said to the FBI? If she lied to the FBI, then isn't that enough to sustain the obstruction? No, I mean as to Mr. Pullman, Mr. Pullman... Oh, I'm sorry, I was wrong, wrong client. Mr. Keston also said that you could take documents, he would be happy if documents were produced afterwards, that he could then turn over to the government with an explanation that they hadn't been in there originally and, but now they have been located. So I think that that is an equally reasonable alternative and therefore no proof beyond a reasonable doubt. Going back to the days off lost and the question about harmless error, I think that if there's no fiduciary duty owed to the Commonwealth, then if the standard is harmless beyond a reasonable doubt, that overwhelming evidence of a fiduciary, breach of a fiduciary duty to spam would be appropriate and here there is no overwhelming evidence of a breach of fiduciary duty to spam. Spam was getting $21 million. The reimbursement request that Pullman put into the Commonwealth was $700,000 that included the $350,000 that Lynch Associates was going to receive. You're agreeing that all we have to look at is whether there's overwhelming evidence of the breach of fiduciary duty element as to the spam? Well, I'm saying that there was no breach of fiduciary duty to the Commonwealth. You just said for the Yates issue as to harmless error, we only need to look at whether there was overwhelming evidence of a fiduciary duty to spam and if there was, it would then be harmless. It would be harmless if there was not overwhelming evidence, if there was overwhelming evidence of breach of honest services as to spam, it would be harmless. But there is no overwhelming evidence. I think I understand. I thought you had said all there needed to be for it to be harmless was overwhelming evidence of the duty to spam. No, of the honest services. And that depends on whether there is a fiduciary duty. Could you just answer Judge Afram's question from before about why it's your view that as a legal matter, there is no way for Pullman to have had a fiduciary duty to the Commonwealth with respect to this transaction? Because he is negotiating against the Commonwealth. The grievance is brought against the Commonwealth. What about the government's argument that even when you're doing that as an employee of the Commonwealth, you can't be doing something so inappropriate as taking a kickback or something like that? So in that sense, since you're dual-hatted, you do have a fiduciary duty even in your role as negotiator against the Commonwealth to the Commonwealth? Well, the question is whether in this transaction, in this negotiation, he had a duty to the Commonwealth. And he could not. If he's negotiating on behalf of the Union, which is acting against the interests of the Commonwealth, as a matter of law, we argue he cannot have a fiduciary duty because that requires a position of trust and confidence, which he didn't have with respect to the Commonwealth in connection with this grievance. But there could be common interests in the negotiation, and with respect to those common interests, might he have owed some duty? For example, neither one of them would want to see Commonwealth funds that could have gone to the members of the Union to go elsewhere. Well, the money that the reimbursement that was coming to SPAM included a $350,000 amount for Lynch Associates. So that was to the Union's benefit because they were getting this $21 million plus $9 million settlement. So his fiduciary... There was no common interest with respect to what was being negotiated? Excuse me? So you're saying there was no common interest? No, not in this respect. His interest was, his loyalties in this negotiation were to SPAM and not to the Commonwealth. Do you agree, usually, fiduciary duty, whether there is one is a question of fact for the jury? That's usually the situation? It is often the situation that is a question of fact. And you have kind of an odd situation here where we're negotiating, sure, but it's not the usual arm's length scenario. It's sort of the person on the other side is also your employee, is an important person in the world of the state police. Does that not muddy it up enough that this was really the question for the jury such that what the relationships really were? Well, Judge Woodlock viewed it as a question of law. He said that it's a matter of law. Yeah, I think that's probably wrong. But is it a question of fact, though? No, I think that, in this case, it is a question of law because he could not owe a fiduciary... Our position is he could not owe a fiduciary duty because it would be an eternal conflict if he were... That's not an evidentiary point. That's just that no matter what evidence you showed, you never can do it as a legal matter given what the test for fiduciary is. Yes. Thank you. Thank you, counsel. At this time, would counsel for the... Dan, let's take... Oh, I'm sorry. I forgot. Go ahead. Just one minute. Yeah. Scott Lopez for Ms. Lynch. In skilling, the government urged the court to allow it to prosecute, quote, undisclosed self-dealing by a public official or private employee under the honest services fraud. Specifically, the government argued taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interest of those to whom he owes a fiduciary duty violated Section 1346. The court rejected that theory. And the court argued that McNally was a classic kickback scheme. And it went on to define it as where a public official, in exchange for steering the state of Kentucky's insurance business through a middleman company, arranged with that middleman company to share its commissions with entities in which the official held an interest. That did not happen here. Skilling requires this court to acquit on the honest services fraud because this is exactly the undisclosed personal interest that the skilling court said doesn't violate the honest services clause. And therefore, Ms. Lynch is entitled to, and Mr. Pullman is entitled to an acquittal on that charge. Thank you. Thank you, counsel. That concludes argument in this case. The court will take a brief recess. I'll rise.